# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| BRIAN SHEPHERD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.   13-cv-1526 |
| | ) | |
| CITY OF EAST PEORIA and STEVE | ) | |
| FERGUSON, | ) | |
| | ) | |
| Defendants. | ) | |

## O P I N I O N  &  O R D E R

This matter is before the Court on cross Motions for Summary Judgment. (Docs. 19 & 22). The motions are fully briefed and ready for disposition. For the reasons stated below, Plaintiff's Motion for Partial Summary Judgment is DENIED and Defendants' Motion for Summary Judgment is GRANTED.

### LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant may demonstrate the absence of a genuine dispute of material fact by citing to admissible evidence, or by showing that the nonmovant cannot produce admissible evidence to support a genuine dispute of material fact. Fed. R. Civ. P. 56(c)(1). Upon such a showing by the movant, the nonmovant may not simply rest

on his or her allegations in the complaint, "[t]he nonmovant may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; it must go beyond the pleadings and support its contentions with proper documentary evidence." *Warsco v. Preferred Technical Grp.*, 258 F.3d 557, 563 (7th Cir. 2001) (internal quotations and citation omitted); Fed. R. Civ. P. 56(c)(1). Typically, all inferences drawn from the facts must be construed in favor of the non-movant, but the court is not required to draw every conceivable inference from the record. *Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009). At the summary judgment stage, however, the court may not resolve issues of fact; disputed material facts must be left for resolution at trial. *Anderson*, 477 U.S. at 249-50.

"On cross-motions for summary judgment, the same standard of review in Federal Rule of Civil Procedure 56 applies to each movant." *Continental Cas. Co. v. Nw. Nat. Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005). The Seventh Circuit has explained that courts "look to the burden of proof that each party would bear on an issue of trial; we then require that party to go beyond the pleadings and affirmatively establish a genuine issue of material fact." *Diaz v. Prudential Ins. Co. of America*, 499 F.3d 540, 643 (7th Cir. 2007) (quoting *Santaella v. Metropolitan Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997)). Cross-motions for summary judgment are considered separately, and each party requesting summary judgment must satisfy the above standard before judgment will be granted in its favor. *See Tegtmeier v. Midwest Operating Eng'rs Pension Trust Fund*, 390 F.3d 1040, 1045 (7th Cir. 2004); *Santaella*, 123 F.3d at 461. Thus, the facts are construed in favor of

the non-moving party, which differs depending on which motion is under consideration. *Tegtmeier*, 390 F.3d at 1045.

At the time of Plaintiff Brian Shepherd's termination, he was employed by Defendant City of East Peoria (the "City") as a wastewater operator in the City's Department of Public Works ("DPW"). Steve Ferguson was the DPW's Director (highest official with the power to take employment actions including hiring, firing and suspending workers) during all times relevant. The wastewater operator is a low level position within the wastewater division of the DPW. Shepherd's job required him to be certified by the Illinois Environmental Protection Agency and to be a member of a union that had a collective bargaining agreement ("CBA") between it and the City. The position also required a valid commercial driver's license. Prior to beginning his employment with the City in the DPW, Shepherd was required to submit to a pre-employment drug screen.

All non-clerical and non-management workers start out by working on garbage trucks in the solid waste division of the DPW. In 1998, Shepherd was able to move into a wastewater operator vacancy in the wastewater division of the DPW. In 2006, Shepherd began working in the wastewater lab. He worked in the lab until his termination in 2012. Shepherd worked under very scant supervision. During the period of time that he held the lab position, Shepherd never drove a commercial vehicle. Nor did he operate any heavy machinery other than a forklift, which he operated on an occasional basis.

---

[1] The facts come from the various submissions offered by both litigants and the jointly-submitted appendix.

The City had an official policy providing that the possession, use, manufacture, sale, or distribution of alcohol, drugs, or other intoxicants or controlled substances on City property, or while at work or on the job for the City constitutes employee misconduct sufficient to warrant termination of the employment relationship. The City also had a personnel manual in place that provided for random, suspicionless drug testing of employees to enforce the City's drug policy, amongst other things. The City, in fact, required its workers in the DPW to be subjected to random drug/alcohol screening. Throughout his employment with the DPW, Shepherd was subjected to several such random drug/alcohol tests. The CBA provided in relevant part that "the City shall not discharge or suspend any employee without just cause, . . . except that the City shall have the right to summarily dismiss or suspend an employee who is under the influence of liquor or drugs while on duty and who fails to obey a direct and reasonable order from the superintendent or foreman, among other reasons."

The City utilized Proctor First Care ("Proctor") to administer its random drug/alcohol screening program. While the City would provide Proctor with a list of employees who were eligible to be selected for testing, Proctor would generate a list of numbers associated with individual employees; randomly draw the numbers; administer and collect the urine specimens; preserve the urine specimens; ship partial specimens of the samples to an independent lab for processing; retain and preserve the remaining sample for future possible testing; have a medical review officer ("MRO") review the results of the drug screen; and finally, notify the City of

the results of a drug screen. Quest Diagnostics ("Quest") was the independent lab responsible for running Proctor's lab tests.

On September 4, 2012, Shepherd was subjected to a random, suspicionless drug screening test by the City conducted by Proctor, pursuant to which he provided a urine sample. A portion of the urine sample was sent to and tested by Quest. According to the test results Proctor received from Quest, Shepherd's specimen tested positive for marijuana metabolites.

Dr. James Ausfahl is a certified MRO employed by Proctor who handles the City's random drug testing program. On September 6, 2012, while at work, Shepherd received a telephone call from Proctor informing him of his test results. Although Shepherd claims he was informed he failed the test due to the detection of opiates, Defendants claim he was informed he failed due to the presence of marijuana metabolites. Meanwhile, Ferguson had been informed that Shepherd failed the drug screen test and had viewed a letter from Dr. Ausfahl stating the following: 1) that Proctor had received results of a drug screen test performed on a sample of Shepherd's urine collected on September 4, 2012; 2) the test had been performed in compliance with NIDA guidelines as per the Department of Transportation by Quest; 3) Dr. Ausfahl had reviewed the chain of custody and the reported results; and 4) the specimen was positive for marijuana. Later on September 6, 2012, Shepherd was summoned into a meeting with Ferguson.

During the course of the meeting with Shepherd on September 6, 2012, Ferguson told Shepherd that the drug screen from the urine sample collected from him had come back positive for marijuana. Shepherd denied smoking marijuana.

Ferguson also told Shepherd he was being suspended without pay indefinitely. Ferguson further advised Shepherd he could appeal their findings and have his own test done. According to Defendants, Shepherd was only entitled to a testing of the remaining sample preserved by Proctor. Defendants do not dispute that Ferguson told Shepherd he could have his own test done, but state that doing so was an error because federal regulations the City must abide by, only allow for the testing of the remaining sample, not altogether new testing.

Ferguson also handed Shepherd document titled "Employee Warning Record," which noted that Shepherd had failed the random drug screen test and tested positive for marijuana. The document also noted that Shepherd was being suspended without pay indefinitely under the CBA for being under the influence of liquor or drugs while on duty. Ferguson told Shepherd to enroll in a substance abuse program ("SAP"). Ferguson told Shepherd that if he was evaluated by a substance abuse professional and declared fit for duty, he would consider this in making his final disciplinary decision. Ferguson also told Shepherd that for a first time offense, the City usually reinstates the person if he is evaluated, treated, and declared fit for duty by an approved substance abuse professional. Indeed, Shepherd knew of at least one employee who had tested positive for drugs, underwent a SAP, was deemed fit to work, and retained his position with the City. Shepherd told Ferguson he was not going undergo evaluation by a substance abuse professional because he didn't think he did anything wrong. Ferguson told him that was something for the substance abuse professional, not Ferguson, to determine.

Ferguson added that Shepherd could not argue with the findings; the substance abuse professional could clear him.

On September 10, 2012, Ferguson sent Shepherd a letter that reiterated the reason for Shepherd's suspension without pay. Ferguson also informed Shepherd that he was required to follow a certified SAP and be declared fit to work by the SAP's licensed counselor or psychiatrist. Ferguson reiterated that if Shepherd successfully completed the SAP, it would be taken into consideration in a final decision on discipline. Ferguson also notified Shepherd he had to produce evidence by September 21, 2012 that he was enrolled in a SAP.

On September 12, 2012 Shepherd sent a letter to Ferguson notifying him that he was appealing his suspension and was going to have an MRO review the results of the City's drug test. Shepherd ended the letter saying the MRO would get in touch with the City within a week. After Ferguson received Shepherd's September 12, 2012 letter, he sent it to the city attorney, who told Ferguson he "did not see any grounds for considering an appeal." The city attorney also told Ferguson that if Shepherd wanted to appeal his suspension, he could file a grievance through the Union.

On September 26, 2012, Ferguson and Shepherd spoke on the phone. Ferguson wrote to Shepherd later that day confirming the conversation and warned Shepherd that his failure to provide evidence that he was enrolled in a SAP by September 21, 2012 could be considered in the discipline action taken by the City. Shepherd was again informed that if he successfully completed a SAP this would likewise be taken into consideration in a final decision on that disciplinary action.

Ferguson received a letter dated October 9, 2012 from Dr. Holden, Shepherd's physician stating that Shepherd had come to him for a drug test after the City's positive test. The letter states in relevant part:

> I am writing this letter as Mr. Shepherd's primary care physician. I am a board certified family practitioner and I am also certified as a medical review officer. My certifications are available if necessary. . . . [Mr. Shepherd] subsequently presented in my office in September, 2012 stating that he had "failed" a drug test and had been told that his test was positive for opiates. He also said that when questioned by the company physician he reported that he was not taking any opiates and therefore it was concluded that he was in denial of his substance abuse and needed treatment for that substance abuse, <u>It is my opinion that Mr. Shepherd does not have a substance abuse problem.</u> Subsequent testing, done here at my office, was negative for all illicit type medications, including opiates. . . . It was also reported to me that he was subsequently told that he had also tested positive for marijuana metabolites but I have no direct evidence what that alleged drug test did show. . . . Enclosed you will find a copy of my note from the September meeting that I had with him and his wife. <u>It is my medical opinion that Mr. Shepherd does not have a drug or alcohol related problem</u> and that his failure in the drug test was because of his error in reporting that he, in fact, had taken Nucynta per medical instructions. . . . Please feel free to contact me with any further questions regarding this issue.

((Doc. 20-8 at 91 (emphasis added)). Dr. Holden enclosed a drug screen test report on a urine sample from September 11, 2012 showing that Shepherd had tested negative for every drug, including marijuana. After receiving Shepherd's September 12, 2012 appeal or Dr. Holden's October 9, 2012 letter, Ferguson contacted Proctor to see if Nucynta could have caused a false positive for marijuana. Ferguson was told it could not, because Nucynta is not in the same class of drugs in that it is an opiate, whereas marijuana is cannabis.

On October 15, 2012 Shepherd's attorney sent a three-page letter to Ferguson questioning the City's drug testing procedures and the applicability of random drug

testing to an employee in Shepherd's position, contending that the City was violating its own policies and may be violating federal and state law in the manner in which it was conducting its random drug testing program. The letter also pointed out that after Shepherd submitted his appeal, he had not been allowed to present any evidence or further medical information. In the letter, Shepherd's attorney also 1) requested a formal meeting to discuss the status of the appeal, 2) requested that the letter be considered as evidence to reverse the employer mandated enrollment in a substance abuse program, 3) explained why the City should reinstate Shepherd, 4) asked for back wages, and 5) suggested a meeting with the city attorney to discuss the matter. Enclosed with the letter was a copy of the drug test Dr. Holden had performed. The letter did not contain a request for testing the remaining specimen of Shepherd's September 4, 2012 urine sample.

The City's attorney responded curtly to Shepherd's attorney's letter on October 30, 2012, indicating that he had reviewed the underlying records concerning Shepherd, and stating that it was not acceptable for Shepherd to ignore the directive to enroll in an SAP or to dispute the requirements of his job.

That same day, Ferguson sent a letter to Shepherd notifying him that his employment was terminated because of his continued refusal to comply with the repeated directive to enroll in a SAP. Shepherd was officially terminated for insubordination, for failing to comply with the Ferguson's directive to enroll in and complete substance counselling treatment. The decision to terminate Shepherd's employment was made by Ferguson after consulting the city attorney. Months later

Ferguson apparently had the remaining portion of Shepherd's September 4th sample tested and it also came back positive for marijuana.

**DISCUSSION**

## I.    Fourth Amendment

The Fourth Amendment of the United States Constitution guarantees the right to be free from unreasonable searches and seizures subject to certain limitations. U.S. Const. amend. IV. It is firmly established that compelled urine testing for drugs are "searches" within the purview of the Fourth Amendment. *Krieg v. Seybold*, 481 F.3d 512, 517 (7th Cir. 2007); *Chandler v. Miller*, 520 U.S. 305, 313 (1997). There is no dispute here on whether Defendants had any suspicion of drug use on the part of Shepherd; his testing was effectuated through the Defendants' implementation of random, suspicionless drug testing for employees of the City's public works division. Shepherd alleges that he was subjected to an unreasonable, and therefore unlawful, search. In general, searches conducted without individualized suspicion are deemed unreasonable, yet such searches will qualify as reasonable if they serve special governmental needs. *Krieg*, 481 F.3d at 517. Whether random drug testing satisfies the Fourth Amendment is a question of law, *Bolden v. Se. Penn. Transp. Auth.*, 953 F.2d 807, 822 n.23 (3d Cir. 1991); and therefore well suited for disposition on summary judgment.

The first question the Court needs to answer is whether the government employee subjected to random drug testing holds a "safety sensitive" position. *Id.* citing *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 630 (1989). To answer that question, courts assess "whether the employee's duties were 'fraught with such

risks of injury to others that even a momentary lapse of attention [could] have disastrous consequences.'" *Krieg*, 481 F.3d at 517 (citation omitted). If the court determines that a special need exists, then it must engage in a balancing of the individual's privacy expectations against the government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context." *Krieg*, 481 F.3d at 517 quoting *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 665 (1989).

In *Kreig*, the Seventh Circuit held that the plaintiff performed a safety sensitive job. 481 F.3d at 518. He regularly operated a one-ton dump truck, a dump truck with a plow, a front end loader, and a backhoe, all of the which the court deemed to be large vehicles and/or heavy equipment that presented a substantial risk of injury to others if operated by an employee under the influence of drugs or alcohol. *Id*. Not only were these vehicles larger and hard to operate in general, but the evidence showed that the plaintiff operated these vehicles near other vehicles and pedestrians in a densely populated, urban area, as opposed to a thinly populated, rural area. *Id*.

Here, Defendants assert the fact that it was possible that Shepherd could be called upon to operate heavy duty vehicles under some extreme emergency indicates he held a "safety sensitive" position. It is undisputed that Shepherd had never before been called upon to operate such vehicles while we was a wastewater operator, a position he held for six years. Moreover, it is undisputed that Shepherd was not required to volunteer for any emergency back-up service, would not receive any reprimand for abstaining from making himself available for emergency service;

and in fact had never signed up for any such duty. Therefore, the Court deems the facts relevant to the City's snow removal program, Shepherd's past garbage worker duties and previous duties before being assigned to the wastewater laboratory, are all irrelevant to the specific question of whether the particular position of a wastewater operator working in the wastewater laboratory is safety-sensitive

However, Defendants also contend—and Shepherd does not dispute—that Shepherd would occasionally operate a forklift within the plant to unload material from a truck or load a barrel on a bridge for one of the clarifiers as part of his duties. (Doc 20-2 at 16-17; Doc. 20-5 at 51). Operating a forklift in a plant is an activity that requires one to be free of impairments. *See Krieg*, 481 F.3d at 518. That Shepherd only "occasionally" engaged in this activity is of no significance because it cannot be seriously disputed that even one attempt at operating a forklift while impaired by drugs or alcohol could result in grave danger to Shepherd himself and his co-workers.[2] The Court finds that the Defendants have properly identified a special need existed for their warrantless and suspicionless drug tests as specifically applied to Shepherd.

Therefore, the Court must proceed to the balancing of Shepherd's privacy expectations against the Defendant's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context." *Krieg*, 481 F.3d at 517. When assessing the practicability of special needs drug testing courts consider the following five factors: "(1) the nature of the privacy interest upon which the search intrudes; (2) the character of the

---

[2] The Court does not accept the proposition that potential harm to Shepherd himself should not factor into the analysis of the City's safety concerns.

intrusion on the individual's privacy interest; (3) the nature of the governmental concern at issue; (4) the immediacy of the government's concern; and (5) the efficacy of the particular means in addressing the problem." *Joy v. Penn-Harris-Madison Sch. Corp.*, 212 F.3d 1052, 1059 (7th Cir. 2000) citing *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646 (1995) (internal citations omitted).

The first factor weighs in favor of Defendants as the Court finds Shepherd had a diminished expectation of privacy. In *Krieg*, the Seventh Circuit held the plaintiff had a diminished expectation of privacy because he had been subjected to drug testing in the past. 481 F.3d at 519. Here, it is undisputed that Shepherd knew as early as November 1993, soon after he began employment with the City, he could be subject to random drug screen testing as an employee of the City's public works department. (Doc. 22 at 30, Doc. 25 at 5). Moreover, it also undisputed that he had been previously subjected to suspicionless alcohol and/or drug testing three times prior to the testing that led to his termination. (Doc. 22 at 30, Doc. 25 at 5).

The second factor also weighs in favor of Defendants as the Court finds the character of the intrusion upon the Shepherd was not unreasonable. In *Krieg*, although the Seventh Circuit did not explicitly state as much, it is clear from the context of the court's discussion that drug testing will be deemed minimally intrusive if it is indeed random. *See* 481 F.3d 519. Shepherd contends that this randomness is actually the reason why the testing is intrusive. He cites to an Arizona state case where that state's supreme court held "random, suspicionless drug testing, while not *per se* unreasonable, invades reasonable privacy interests even when the government collects the urine sample in a relatively unintrusive

manner and takes steps to protect employees' privacy interests by limiting the information that is disclosed." *Petersen v. City of Mesa*, 207 Ariz. 35, 43, 83 P.3d 35, 43 (2004). Obviously, this Court will follow the precedent of the Seventh Circuit over the precedent of an appellate court from outside the circuit; especially given the law in question concerns the federal Constitution. So the Court rejects Shepherd's argument that the testing is *per se* unreasonably intrusive because it is random.

In *Acton*, the United States Supreme Court explained that the "degree of intrusion depends upon the manner in which production of the urine sample is monitored." 515 U.S. at 658. There, the Court noted that male students produced urine samples at a urinal while remaining fully clothed and only observed from behind, if at all. *Id*. Female students produced samples in enclosed stalls with a female monitor standing outside listening only for sounds of tampering. *Id*. The Court held that those conditions were nearly identical to those typically encountered in public restrooms, which people use daily and therefore, the privacy interests compromised by the process of obtaining the urine sample were negligible. *Id*. The Court also held privacy interests were negligible because the tests were designed to detect nothing more than the presence of illegal drugs. *Id*.

Neither side in this litigation has presented any argument or evidence that the testing here is any more or less intrusive than is necessary to collect and preserve useful urine samples. While the Shepherd states that the City selects the pool of its workers who can be selected for testing, he does not dispute that the City's agent who administers the testing, Proctor, randomly draws the workers who

will be tested. In short, the character and degree of intrusion upon Shepherd are minimal and not unreasonable intrusive.

The third consideration in this analysis is the nature of the governmental concern at issue. The Court does not find the Defendants' dubious assertions of potential snowplowing and handling purportedly hazardous materials to be legitimately applicable to Shepherd, but he himself conceded that he occasionally operates a forklift as one of his job duties. Remarkably, neither side has presented any information directly on exactly how frequently Shepherd actually operated the forklift and who was present when he operated the machine. However, Shepherd does not dispute that there were long periods of time when he would perform his duties without any day-to-day supervision or monitoring. (Doc. 22 at 19).[3] This Court concludes that a substance-impaired operator of a forklift can conceivably cause great damage to property and persons at the plant before anyone with the authority to force Shepherd to stop working and submit to drug testing could observe noticeable signs of impairment. *See Skinner*, 498 U.S. at 628. Thus, the Court is of the opinion that the concern at issue here is indeed compelling.

The fourth consideration is the immediacy of the government's concern. If the government can point to a demonstrated problem of drug abuse by the targeted group, reviewing courts are more likely to find the concern immediate. *E.g.*, *Chandler*, 520 U.S. at 319. However, it has also been noted that "a demonstrated

---

[3] There is also evidence that Shepherd worked at times when no one else was present in the plant, which of course, would lessen the danger that his operation of the forklift was an immediate danger to others. *Skinner,* 489 U.S. at 628. On the other hand, Shepherd testified that he would operate the forklift to take something off a truck, as well as for other reasons. This implies at least a truck driver was present or nearby during Shepherd's use of the forklift.

drug abuse problem is not always necessary to the validity of a testing regime, even though some showing of a problem does shore up an assertion of a special need for a suspicionless general search program." *Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls*, 536 U.S. 822, 824 (2002) cited by *Krieg*, 481 F.3d at 519. Defendants have offered no evidence supporting a finding that the City's public works employees had a demonstrated problem of drug or alcohol abuse by the targeted group. In *Earls*, the Supreme Court held that "the need to prevent and deter the substantial harm of childhood drug use" provided "the necessary immediacy for a school testing policy" at issue there. 536 U.S. at 836. This means that in some cases, the nature of the government concern can be deemed so compelling as to establish the immediacy of the testing policy. Here, Shepherd has attempted to cast the City's concern over impaired employees as a fabrication asserted for the purposes of this litigation; not a true concern for safety. The Court rejects Shepherd's contention because he does not dispute that the City's substance abuse policy states: "Being under the influence of drugs, intoxicants, or other controlled substances or alcohol on the job presents serious health and safety risks, not only for the employee/abuser, but for co-workers and other individuals who may be working with or in proximity to the employee." (Doc. 22 at 25, Doc. 20-9 at 25). The Seventh Circuit gave this particular consideration short thrift in *Krieg*, basically taking for granted that because the court had already found a compelling interest for the testing, the immediacy of the need was firmly established. 481 F.3d at 519. Having found that the safety concern of protecting coworkers and the plant is indeed compelling given Shepherd's use of heavy machinery, the Court also finds

the concern was immediate such that it would make little sense to wait for Shepherd to be actually impaired, operate the forklift, and create a tragedy before taking reasonable steps to prevent a tragedy.

The last consideration is the efficacy of the particular testing in addressing the targeted problem. Neither Defendants nor Shepherd address this factor in their submissions to the Court. The obvious goal of the random urine testing is to mitigate the risk of workers performing their jobs while under the influence of drugs and alcohol. It is thought, quite reasonably, that if subjected to random testing, the workers are less likely to use drug and alcohol because they will want to avoid testing positive and being subjected to possibly losing their jobs. Shepherd hints in his response brief at an argument against weighing this factor in favor of Defendants. He states "if there was reason to suspect that he was under the influence of drugs [his supervisors] could have required him to submit to a drug screen." (Doc. 25 at 34). The Court has already explained that it believes a substance-impaired operator of a forklift can conceivably cause great damage to property and persons at the plant before a supervisor could observe noticeable signs of impairment and force Shepherd to stop working and submit to drug testing. Moreover, this argument has been raised and rejected in both the United States Supreme Court, *see*, *e.g.*, *Acton*, 515 U.S. at 663 ("We have repeatedly refused to declare that only the 'least intrusive' search practicable can be reasonable under the Fourth Amendment.") and the Seventh Circuit, *Krieg*, 481 F. 3d at 519 (holding the same).

In short, having balanced the applicable factors, the Court concludes that the evidence presented leaves no genuine issue of dispute that Shepherd's privacy expectations are outweighed by the Defendant's interests in subjecting him to random, suspicionless drug testing and the City of East Peoria did not commit a violation of the Fourth Amendment. Therefore, Shepherd's claim is denied.

## II. Due Process Claims

Shepherd brings essentially three temporally distinct, yet thematically inextricable, procedural due process claims against Defendant Ferguson in his Complaint.[4] He claims he was subjected to pre-deprivation and post-deprivation of due process in relation to his suspension upon testing positive for drugs. He also claims he was subjected to pre-deprivation and post-deprivation of due process in relation to his termination. Thus, Shepherd claims he was deprived of procedural due process before he was suspended; after he was suspended yet facing termination; and after termination. For purposes of disposing of the cross motions for summary judgment, Ferguson has conceded that Shepherd had a constitutionally protected property interest in his position with the City and that he was deprived of it. Thus, the question remaining for the Court to decide is whether the process afforded to him was constitutionally sufficient. *See Krieg*, 481 F.3d at 519 ("A plaintiff alleging a due process violation must demonstrate 1) that he had a property interest and 2) that he was deprived of this interest without due process of law.").

---

[4] Shepherd only directed his due process claims against Dave Mingus and Steve Ferguson in the Complaint (Doc. 1) and on January 16, 2015, Shepherd successfully moved to dismiss Dave Mingus from this action. (January 16, 2015 Text Order).

**Pre-Suspension**

On September 4, 2012, Shepherd was tested for drugs by a urine test administered by Proctor in accordance with the City's random drug testing program. He tested positive for marijuana. Shepherd was informed via telephone by Proctor personnel of the results of his test on September 6, 2012. There is dispute over what drugs Shepherd was actually advised he tested positive for, but the issue is not important. On that same day, Shepherd was summoned into a meeting with Ferguson who informed him that per the City's policy, he was to be suspended indefinitely without pay and was required to see a substance abuse specialist before he could seek reinstatement. He was further told that Shepherd's enrollment in a SAP would be considered in Ferguson's final determination. Shepherd disputed the results of the test and was told by Ferguson that he had a right to his own test and could appeal their findings. Ferguson told Shepherd that if he was evaluated by a SAP professional and declared fit for duty, he would consider this in making his final decision. It was the City's usual practice to reinstate a first-time offender if the offender is evaluated, treated, and declared fit for duty by an approved substance abuse professional. Shepherd told Ferguson he was not going to undergo evaluation by a substance abuse professional because he did not think he did anything wrong. During the course of that meeting Ferguson handed Shepherd a document entitled "Employee Warning Record," which noted that Shepherd had failed a random drug screen test and tested positive for marijuana. The document also noted that Shepherd was being suspended without pay indefinitely under the CBA for being under the influence of liquor or drugs while on duty.

Shepherd claims that his meeting with Ferguson on September 6, 2015 was a sham and he was denied due process because the decision to suspend him had already been made given the document effectuating the suspension was created prior to the meeting. This Court finds that the meeting was not a sham and Shepherd was not deprived of due process before he was suspended.

The whole point of the random testing is to keep impaired workers from working. Shepherd was immediately suspended upon Ferguson receiving notice from Proctor (and clearing the suspension with his supervisors/advisers) that Shepard tested positive for marijuana. This demonstrates the efficacy of the drug testing program, not some insidious deprivation of due process. Given the City's legitimate concern of disallowing impaired workers from operating vehicles and machinery, once a supervisor is made aware that a medical professional has found that a worker who operates vehicles and/or machinery tested positive for impairment-causing substances, an immediate suspension from working is the proper response, and may indeed be the most objectively reasonable response. *Gilbert v. Homar*, 520 U.S. 924, 930-31 (1997) ("An important government interest, accompanied by a substantial assurance that the deprivation is not baseless or unwarranted, may in limited cases demanding prompt action justify postponing the opportunity to be heard until after the initial deprivation.").

Allowing such an employee to return to work would undermine the very reason for the testing, which is keeping impaired individuals from operating vehicles and heavy machinery. It would also allow room for subjective application of criteria where the decision to suspend a given worker could be influenced by

improper factors such as the worker's race, sex, relation to the supervisor, political affiliation, or other unfair bases.

In this instance, Shepherd concedes he operated a forklift as part of his job duties, so suspension from his job upon testing positive for drugs was absolutely reasonable and satisfied due process. In *Chaney v. Suburban Bus. Div. of the Regional Transp. Auth.*, 52 F.3d 623 (7th Cir. 1995), the Seventh Circuit explained that in certain circumstances, a public employer may suspend a worker without notice and a hearing. The court affirmed that due process is a flexible concept and rejected any notion that there is a rule that a hearing must be held in every case before a public employee can be deprived of employment. *Id.* at 628 citing *Mathews v. Eldridge,* 424 U.S. 319, 334 (1976). In *Chaney*, the employer suspended a bus driver *pending* the results of drug and alcohol testing after the driver was involved in an accident in which a pedestrian was struck. 52 F.3d at 626. The court held that Chaney was on notice as to why he was being suspended and the employer's interest in both managerial efficiency and in public safety clearly outweighed his interest in a pre-suspension hearing. *Id.* at 628.

This is the exact situation here, yet Shepherd has not even addressed *Chaney* in his submissions to the Court. There is no dispute that Shepherd knew he was being suspended for failing the urine test and this Court has already found that the City has a compelling interest in keeping impaired workers from working when their jobs involve operating machinery capable of harming others. Moreover, Shepherd has not provided the Court with any reason to opine that Ferguson was unreasonable to believe the results of the Proctor administered drug test <u>before</u> the

suspension was imposed. In short, Shepherd was not deprived of due process of law when he was subjected to an automatic suspension following his testing positive for drugs.

**Post-Suspension/Pre-Termination**

Shepherd was informed in the September 6, 2015 meeting where he was given official notice of his suspension, that he had the right to get his own test done and to file an appeal.[5] He did both. Shepherd saw his own physician, Dr. Holden, who was a certified medical review officer. Dr. Holden drug tested Shepherd on September 11, 2012 and found negative results for any illicit drugs including marijuana.[6] Moreover, his physician unequivocally stated that in his opinion, Shepherd did not have a substance abuse problem. Ultimately, he was fired—not for failing the City's drug screen—but instead, for failing to comply with the Ferguson's directive to enroll in and complete substance counselling treatment.

There is no doubt that Shepherd was deprived of the procedures outlined by the CBA and Article II, Section 2.12(c) of the City's employee manual during this timeframe. There is no dispute that Shepherd was never told that failing to enroll in a SAP was in and of itself, a terminable offense. There is no dispute Shepherd

---

[5] Defendants contend that Ferguson was incorrect to tell Shepherd he had a right to his own test and that Shepherd merely had a right to a testing of a preserved portion of the same urine he gave in the initial Proctor administered test. Whether Ferguson was right or wrong is really inconsequential. First, there is no dispute that Ferguson told him he had a right to his own test. Second, Section 2.6 of the City's policy is rather ambiguous such that a retest is not necessarily foreclosed by the language. Regardless, the official Employee Warning Shepherd received also stated he may take another test at his own expense.

[6] The Court finds Defendants' insinuation that Holden's letter only informed Ferguson that Shepherd tested negative for opiates and not marijuana to be patently false and improper because Holden clearly conveyed the drug screen he performed on Shepherd came back negative for <u>any illicit drugs</u>, not merely opiates.

was told he could appeal and he in fact filed a letter of appeal, but the City ignored it. Moreover, having received a report from a medical professional showing Shepherd had not tested positive for any illicit drugs, at a minimum, Ferguson should have had doubt over the Proctor administered testing such that he should have taken Mr. Shepherd's appeal seriously. Furthermore, there is no dispute that Mr. Shepherd presented the opinion of a medical professional that he had no substance abuse problem. It would make little sense to have to go through an SAP when one did not use illicit substances in the first place. Ferguson was already on notice that Shepherd was challenging his suspension on the grounds that he hadn't used marijuana and did not have drug problem.

So, the Court finds that Ferguson did not follow the City's own procedures in terminating Shepherd. The failure of public employer to follow its own procedures does not in and of itself violate due process. *See Osteen v. Henley,* 13 F.3d 221, 225 (7th Cir.1993) ("a violation of state law ... is not a denial of due process, even if the state law confers a procedural right"). Constitutional due process "requires that individuals have an opportunity to be heard 'at a meaningful time and in a meaningful manner' regarding the deprivation of life, liberty, or property." *Wainscott v. Henry*, 315 F.3d 844, 852 (7th Cir. 2003) citing *Mathews v. Eldridge,* 424 U.S. 319, 333 (1976). Normally "a public employer must provide certain pre-termination procedures before removing an employee. These include (1) oral or written notice of the charges; (2) an explanation of the employer's evidence; and (3) an opportunity for the employee to tell his side of the story." *Wainscott*, 315 F.3d at 852 (citations omitted).

The only terminable charge Shepherd was aware of was being on the job while under the influence of drugs. He was never informed that his failure to enroll and complete a SAP would result in his termination. There is no dispute that Shepherd was only told that enrolling in and completing a SAP was something to be taken into consideration in a final decision on discipline. (Doc. 20-8 at 88 ("If successfully completed, your progress will be taken into consideration in a final decision on discipline."); at 92 ("You did not produce evidence by September 21, 2012 that you have enrolled in a Substance Abuse Program. This can be considered in the decision regarding the disciplinary action taken by the City. If a SAP is successfully completed, your progress will be taken into consideration in a final decision on that disciplinary action.")). Yet, Ferguson terminated him for his insubordinate failure to enroll and complete a SAP. A public employee with a constitutionally protected property interest in his job cannot be terminated for a reason of which he was not properly notified. *See Wainscott*, 315 F.3d at 853 ("a pre-termination hearing requires notice of the charge, an explanation of the basis for the charge, and an opportunity for the employee to respond.") citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985). Since Shepherd was never apprised that his failure to enroll and complete a SAP was an offense for which he could be terminated there is no doubt Ferguson should not have terminated him for insubordination and doing so violated his pre-termination due process rights.

Moreover, he can hardly be said to have been given an opportunity to present his side of the story <u>before he was terminated</u> when Ferguson summarily rejected his evidence consisting of Dr. Holden's report showing he tested negative for any

illicit drugs and Dr. Holden's opinion that Shepherd had no drug problem. There is no dispute that Shepherd was told he could appeal <u>his suspension</u>, and he did so on the basis that he did not use illicit drugs. Ferguson, on the advice from the city attorney, took the position that there were no grounds to even consider an appeal. Thus, Ferguson inexplicably decided not to follow his own procedures as outlined in the CBA allowing for an appeal of a suspension.

Ferguson harmed Shepherd by firing him for insubordination and disregarding the appeal of his suspension. Now the Court must determine whether there were adequate post-deprivation remedies available that Shepherd chose not to avail himself that dooms his claim. While a plaintiff is not required to exhaust remedies to bring a § 1983 claim, this does not change the fact that there can be no due process violation where there were adequate remedies in place to protect the plaintiff's interests. *See Veterans Legal Def. Fund v. Schwartz*, 330 F.3d 937, 941 (7th Cir. 2003).

In *Loudermill*, the Supreme Court explained that even though pre-termination procedures need not be formal or extensive, they must at a minimum provide notice and an opportunity to respond to the charges precipitating termination. 470 U.S. at 546. Similarly, in *Chaney*, the Seventh Circuit announced that "due process requires pre-termination notice and an opportunity to respond even where a CBA provides for post-termination procedures that fully compensate wrongfully terminated employees." 52 F.3d at 629. Based upon the foregoing cases, the Court must find that Shepherd was denied notice and a hearing during this post-suspension/ pre-termination period. But neither *Chaney* nor any other case

presented to this Court by the parties speak to whether a public employee—who was denied a post-suspension hearing and pre-termination notice yet still had post-termination procedures available to him that he chose to forego—can be found to have been denied due process. *Loudermill*'s holding presupposed that "the only meaningful opportunity to invoke the discretion of the decisionmaker <u>is likely to be before</u> the termination takes effect." 470 U.S. at 543 (emphasis added), *see also Carmody v. Bd. of Trustees of Univ. of Illinois*, 747 F.3d 470, 475 (7th Cir. 2014). This is not the case here.

Here, Shepherd was provided through his CBA the opportunity to challenge his termination through the use of an appeal brought by himself or a grievance procedure through his Union. He chose not to pursue either procedure. In *Zinernon v. Burch*, the Supreme Court wrote

> In procedural due process claims, the deprivation by state action of a constitutionally protected interest in "life, liberty, or property" is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest without due process of law. The constitutional violation actionable under § 1983 is not complete when the deprivation occurs; <u>it is not complete unless and until the State fails to provide due process</u>. Therefore, to determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate. This inquiry would examine the procedural safeguards built into the statutory or administrative procedure of effecting the deprivation, and <u>any remedies for erroneous deprivations</u> provided by statute or tort law.

494 U.S. 113, 125-26 (1990) (citations omitted) (emphasis added). If the constitutional violation actionable under § 1983 is not complete unless and until the public employer fails to provide due process, then the existence of available procedures to remedy the violation would seem to satisfy due process. The harm Shepherd suffered was his termination, which was made illicit by the failure of

Ferguson to provide Shepherd proper notice and a meaningful hearing. But Shepherd still had available to him the ability to appeal his termination, on his own or through the grievance procedure with his union, and thus he could have challenged his termination on the bases that 1) Ferguson provided no notice of insubordination and 2) Ferguson failed to consider his evidence exculpating him of suspected drug use. Considering the entire process available to Shepherd, the Court cannot find he was denied due process. *See Yahnke v. Cnty. of Kane*, No. 12 C 5151, 2015 WL 1980248, at *5 (N.D. Ill. Apr. 30, 2015) ("When determining what process is due in the context of unauthorized deprivations of a protected property right, if there is an adequate post-deprivation state law remedy available, this remedy is all the process a plaintiff is due.")

**Post-Termination**

The Court finds that Shepherd has waived any claim as to post-termination due process because he concedes that he did not follow the procedures available to him for challenging his termination. After Shepherd was suspended, he called the president of his Union and asked for the Union's help in challenging his suspension. But the Union president refused to help, calling Shepherd a drug addict and telling him to get some help. Shepherd did not contact his Union steward, as contemplated by the CBA. Shepherd did not make any further attempts to seek the Union's help after his employment with the City was terminated. Nor did he file his own appeal of his termination.

In *Hudson v. City of Chicago*, 374 F.3d 554 (7th Cir. 2004), the Seventh Circuit affirmed a district court's finding that terminated officers had not been

deprived of due process although they were terminated through the use of an abbreviated process in which officers absent for four consecutive days without providing the department with notice are summarily terminated. Although the Court finds that *Hudson* has no relevance to Shepherd's pre-termination due process claims, it is completely apposite for analyzing his post-termination claim. First, the *Hudson* court recognized that grievance procedures created by collective bargaining agreements can satisfy the requirements of due process for terminated employees. *Id.* at 563 (citations omitted). The court noted that the officers had a CBA grievance procedure for police officers to utilize but the officers failed to file a grievance pursuant to the CBA, and therefore neither plaintiff participated in the post-deprivation grievance process. *Id.* The court explained that the police union's refusal to initiate grievance proceedings on the plaintiffs' behalf had no impact on the question of whether the City violated the due process rights of the officers because the City could not be blamed for the inaction or mistakes of the Union. *Id.* at 564.

Here, no dispute exists that Shepherd did not pursue a grievance or an appeal of his discharge. Just as the *Hudson* plaintiffs failed to file a grievance pursuant to their CBA, Shepherd has failed to do so here. Therefore, the Court concludes that Shepherd failed to participate in the post-deprivation grievance process, and the Defendant cannot be found to have violated Shepherd's due process rights after his termination.

## III. Qualified Immunity for Ferguson

Having found Defendants did not commit constitutional violations, the Court has no need to consider whether Ferguson's conduct was protected by the doctrine of qualified immunity.

CONCLUSION

IT IS THEREFORE ORDERED, Plaintiff's Motion for Partial Summary Judgment (Doc. 19) is DENIED and Defendants' Motion for Summary Judgment (Doc. 22) is GRANTED.

So ORDERED.

CASE TERMINATED.

Entered this 21st day of May, 2015.

s/ Joe B. McDade
————————————————
JOE BILLY McDADE
United States Senior District Judge
